Portland Gasoline Company, a Corporation v. Commissioner.
Portland Gasoline Co. v. Commissioner
Docket No. 17397.
United States Tax Court
1949 Tax Ct. Memo LEXIS 194; 8 T.C.M. (CCH) 449; T.C.M. (RIA) 49108; May 9, 1949
Clark G. Clinton, Esq., and W. B. Clinton, Esq., 917 Liberty Bank Bldg., Dallas, Tex., for the petitioner. J. Frost Walker, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: This proceeding involves declared value excess-profits tax and excess profits tax for the year 1943, deficiencies having been determined against petitioner in the following amounts: Declared Value Excess-Profits Tax
$ 1,057.20
Excess Profits Tax
17,619.05 and an overassessment of income tax, for the same year, in the amount of $3,837.66. The issues *195 to be determined are: (1) Did the payment by petitioner of $10,000 on November 26, 1943, to E. D. Ulrich in satisfaction of a note dated May 15, 1930, due August 15, 1930, executed by the Allen Gasoline Company, guaranteed by the Forrest E. Gilmore Company of Texas, constitute (a) an ordinary necessary business expense within the meaning of section 23 (a) (1) (A) of the Internal Revenue Code, or (b) a loss within the meaning of section 23 (f) of the Internal Revenue Code, or (c) a bad debt within the meaning of section 23 (k) of the Internal Revenue Code, or (d) whether such a payment gives rise to a deduction to petitioner for interest paid or accrued within the meaning of section 23 (b) of the Internal Revenue Code? (2) Was the amount of $4,773.92 expended by petitioner during 1943 on a steam condensing tower a capital expenditure or an ordinary and necessary business expense? The case was submitted on a stipulation of facts and oral evidence. The facts as stipulated are so found. Such part thereof as it is considered necessary to set forth is included with other facts found from evidence adduced *196 in our Findings of Fact Portland Gasoline Company, petitioner herein, was incorporated under the laws of the state of Delaware on March 14, 1934. Its principal business is the manufacturing and processing of gasoline and by-products of gasoline at its only plant near Pampa, Texas. Chester A. Sheppard has been its president since it was organized. Its income and excess profits tax returns for 1943 were filed on or before March 15, 1944, with the collector of internal revenue for the second district of Texas. Petitioner keeps its books and records and filed its income and excess profits tax returns for 1943 on an accrual basis of accounting. The Allen Gasoline Company (hereinafter sometimes referred to as Allen Co.) and the Forrest E. Gilmore Company of Texas (hereinafter sometimes referred to as Gilmore Co. of Texas) were subsidiaries of the Forrest E. Gilmore Company of Delaware (hereinafter sometimes referred to as Gilmore Co. of Delaware). Sheppard was president of Gilmore Co. of Delaware and Gilmore Co. of Texas and vice-president of Allen Co. On May 15, 1930, Allen Co. borrowed $20,000 from Western National Bank in Los Angeles (hereinafter sometimes referred to as Western *197 Bank) and gave its note therefor dated May 15, 1930, bearing 7 per cent interest, and due August 15, 1930. The payment of the note was guaranteed by Gilmore Co. of Texas for a good and valuable consideration. The proceeds of the note were divided $10,000 to Allen Co. and $10,000 to Gilmore Co. of Texas. Prior to May 21, 1930, Gilmore Co. of Texas paid $10,000 on the note to the Western Bank. The plant of Allen Co. was destroyed by fire some time in the late summer or fall of 1930 and no insurance could be collected as a result of the fire. Allen Co. could not and did not pay its part of the above note and Gilmore Co. of Texas was liable thereon. The Western Bank endorsed the note without recourse and it came into possession of E. D. Ulrich some time prior to March 14, 1934. On March 28, 1930, Gilmore Co. of Texas gave its note in the amount of $500,000, secured by a mortgage on its properties to Security Savings & Trust Company of Portland, Oregon (hereinafter sometimes referred to as Security Co.). The Security Co. issued trust certificates against this note and mortgage in the amount of $482,000. One of the holders of a portion of these trust certificates was Ulrich. After the *198 note and mortgage had been issued certain creditors of Gilmore Co. of Delaware, the parent company, brought suit against the company and in the action made Gilmore Co. of Texas a party. The Security Co. intervened in the proceedings in order to protect the mortgage it held on the properties of Gilmore Co. of Texas. Ulrich held $18,000 in trust certificates. During the month of January 1932 the holders of the trust certificates issued by the Security Co. and secured by the mortgage on the property of the Gilmore Co. of Texas entered into an agreement with each other which had for its immediate object the acquisition of the properties of Gilmore Co. of Texas under foreclosure and the organization of a new corporation. The agreement provided, among other things, that should they (the subscribers to the agreement) acquire the properties they would accept, severally, either first mortgage bonds against the newly acquired property, and/or trust certificates secured by a first mortgage, for the amount of their respective claims, plus accrued interest, and plus such cost as may be incurred by them in the acquisition of the property; that the equity in the property above the abovementioned *199 mortgage was to be made available to certain security holders of the Gilmore Co. of Delaware, on the condition that the subscribers to this agreement were to have a first mortgage lien upon all the property until they were paid their claims plus all interest; and that in the event the properties were acquired by the trustees (selected by the subscribers) they were to organize a new corporation, petitioner herein). The agreement also provided, in part, as follows: "(d) Said committee is hereby authorized and empowered to issue enough trust certificates and/or mortgage bonds to pay all of the undersigned in full, plus accrued interest and such further claims against the said property as may be lawfully made at the time of sale, including all claims created by the said trustees, and/or approved by them, together with all costs and disbursements including attorneys' fees heretofore or hereafter created either in the foreclosure proceedings or in the organization of said corporation. * * *
"10. The undersigned understand that should the property now owned and operated by the Forrest E. Gilmore Company of Texas be acquired at a judicial sale, they will own all of what is known *200 as Plant No. 3, or the Pampa Plant, situated in Gray County, Texas, together with all the contracts, franchises and rights now held by the Forrest E. Gilmore Company of Texas. As such owners, the undersigned are willing, so long as their present situation is not changed and the funds heretofore loaned by them are amply and properly secured, that the holders of securities of the Forrest E. Gilmore Company, a Delaware corporation, be protected to the extent of any equity there may be in said property over and above the mortgage. With this in mind, the foregoing plan has been determined upon as a fair and equitable basis upon which the security holders of the Forrest E. Gilmore Company, a Delaware corporation, may participate in the assets and property of the Forrest E. Gilmore Company of Texas. The plan suggested herein is not intended to tie the hands of the board of directors of said corporation to be organized, [petitioner herein] and/or the voting trust committee, in operating the properties to be acquired or in the running of the corporation, but the plan is intended to authorize, and does hereby authorize, the voting trust committee and/or the board of directors of said corporation *201 to be organized to carry the above plan out, and to do such other things as they may deem necessary or proper, so far as the undersigned are concerned, to make said corporation to be organized successful. With this in view, the voting trust committee and/or the board of directors of said corporation to be organized are authorized to impose such conditions as they may deem prudent and proper upon the security holders of the Forrest E. Gilmore Company, a Delaware corporation, when an exchange of securities is made, and to require the performance of such conditions as they may impose as a condition precedent to the exchange of securities. Failure on the part of the security holders of the Forrest E. Gilmore Company, a Delaware corporation, to perform said conditions shall operate as a forfeiture of any right that may be granted them to participate in the exchange of securities." Sheppard, acting as trustee, under the agreement above, bid in at foreclosure sale all of the properties of Gilmore Co. of Texas and a sheriff's deed was given to him, as trustee, on November 8, 1933. From that date until March 14, 1934, the former properties of Gilmore Co. of Texas were operated by Sheppard, *202 as trustee, and on March 14, 1934, Sheppard, as trustee, conveyed all the properties to petitioner, which was formed pursuant to the above-mentioned agreement. On June 1, 1934, petitioner issued its sinking fund bonds in the amount of $482,000 to the holders of the trust certificates secured by a mortgage on the properties of the Gilmore Co. of Texas. Shortly after petitioner was organized E. D. Ulrich, owner and holder of the above-mentioned Allen Co. note, made demand of petitioner, through its president and board of directors, to pay the balance due on the note, threatening suit against the corporation and to disrupt its plans. Sheppard, petitioner's president, orally told Ulrich that he would be paid when the bonds were paid off. Sheppard had five directors but it was his responsibility to make petitioner a success. He made a "deal" with Ulrich and reported it to the board of directors, and they said, "Okay, but we can't pay it until after the mortgage indebtedness is paid." Ulrich had demanded payment of Sheppard about the time he bid the property in on forelosure. He wanted Sheppard to treat him as a bondholder as to the $10,000. Sheppard had never before failed in business *203 and the company's failure "broke his heart," and he made up his mind to repay everyone. He has repaid or is repaying everyone, including the stockholders of the Gilmore Co. of Delaware. At a meeting of the board of directors of petitioner duly called and held November 4, 1943, the following resolution was passed and adopted: "The President then stated that this corporation was obligated to pay $10,000.00 in interest and principal on a note held by E. D. Ulrich for the sum of $10,000.00, upon which there is now due over $7,000.00 in interest. The President stated that at the time this corporation was organized it agreed, for a valuable considerable, to pay to the holder of this note the sum of $10,000.00 after all the outstanding bonds were paid. The President proposed that the company offer to pay to the holder of the note the interest in full up to the time the note is surrendered and the balance of said $10,000.00 to be applied on the principal, provided the owner and holder of the note would agree to cancel the note and return it after cancellation to this corporation, with the endorsement on the back of the note of the amount of interest paid and the further endorsement on *204 the note that it was fully paid and cancelled. Whereupon, the following resolution was moved, seconded, and adopted, R. M. Fox not voting: "'BE IT AND IT IS HEREBY RESOLVED: That the President be and he is hereby authorized to offer to settle the said note hereinbefore referred to upon substantially the terms hereinbefore set out.'" In compliance with the resolution petitioner issued its check dated November 26, 1943, in the amount of $10,000 payable to Ulrich, and received from Ulrich the note shown paid and a release. The release acknowledged payment of $7,175 in interest and $2,825 on the principal. Endorsements on the back of the note are as follows: Amount of
Amount of
Date of Payment
Principal
Interest
May 21, 1930
$10,000
Aug. 11, 1930
$ 175
Nov. 17, 1930
175
Feb. 21, 1931
175
Apr. 21, 1931
175
Mar. 24, 1933
1,225
Dec. 13, 1933
350
It was useless for petitioner to attempt to collect anything from the Allen Co. The final payment on the sinking fund bonds was made in December 1943. During the year 1943 petitioner expended a total of $4,773.92 on a steam condensing tower, as follows: Condenser sections
$3,353.81
Pipe
54.76
Labor
701.71
Lumber
663.64
*205 which represents the cost of material and labor. The steam condensing tower, here in question, was used as a cooler. The complete unit was originally constructed in 1937 or 1938 and cost between $10,000 and $15,000; the 1943 cost of such a tower would have been about $20,000. The tower consisted of ten or twelve condensing sections. Eight or nine of the condensing sections were replaced with new ones. The above expenditure of $4,773.92 was the cost of the condensing sections and the labor and material used in installing them. The ordinary life of a condenser section is from two to five years. A condenser section used for colling water, as are the ones used here in question, will last much longer than will condenser sections used for cooling oil. Opinion (1) The first question for our consideration is whether the $10,000 payment made by petitioner to E. D. Ulrich on November 26, 1943, constituted an ordinary necessary business expense, or a loss, or a bad debt, or a deduction for interest paid or accrued under sections 23 (a) (1) (A), 23 (f), 23 (k), or 23 (b) of the Internal Revenue Code. The petitioner argues first that the $10,000 is an expense deductible *206 because of liability under an agreement to pay, made to avoid litigation. It then argues in the alternative that the taxpayer corporation resulted from a taxable reorganization in which its stock and bonds were exchanged for all property of the Forrest E. Gilmore Company of Texas and the debts of that company were paid so that the $10,000 was a loss arising our of such acquisition of properties. It next argues in the alternative that the payment was one upon a debt upon which it was secondarily liable, arguing that there was implied assumption of the debts of the Forrest E. Gilmore Company of Texas, by virtue of the agreement among the bondholders to issue trust certificates or bonds to pay them in full "and such further claims against the said property as may be lawfully made at the time of sale * * *." The burden, of course, is upon the petitioner to demonstrate the deductibility of the $10,000. The gist of its argument is that in addition to the reorganization agreement to issue $482,000 in bonds it was necessary to pay the $10,000 to Ulrich upon his claim. What was the nature of that claim? It is intimately associated with the formation of the new corporation. The petitioner has *207 argued under its alternative propositions, first, that the payment was a loss "arising out of the acquisition of the properties of Forrest E. Gilmore Company of Texas"; also that "while there was no definite expressed assumption of the obligation of Forrest E. Gilmore Company of Texas there certainly was the implied assumption of said company's obligations." The petitioner says in substance that in connection with the acquisition of the assets and property of the Texas company and the payment of all of its debts it was forced by threats to agree to the payment of the $10,000 and thus cleared its business of the hazard of threatened litigation. It argues that had there not been settlement of the claim the petitioner would have been prevented from organizing. Sheppard, petitioner's witness and president, testified that Ulrich made demand upon him for payment of the $10,000 about the time he bid in the property under the pre-organization agreement; that Ulrich wanted to be treated as a bondholder; that he threatened to sue and "disrupt all our plans"; that he also made demand after petitioner was organized, as well as prior thereto; and that settlement was made by agreeing to pay Ulrich *208 when the bonds were paid off. Under all of these circumstances it seems peculiarly logical to hold, as we do, that the petitioner has a burden of showing that the $10,000 was not a capital expenditure in the acquisition of the properties. If, as petitioner argues, there was assumption of the debt it is clear that the $10,000, as well as the $482,000 in bonds issued to the holders of the trust certificates, constituted capital expenditure for the acquisition of the properties. The payment was in fact made when the corporation, several years after the reorganization, was able to do so and thus did not preserve or protect a going business at that time; but passing that thought and devoting attention to the agreement to pay the $10,000 when it was made in 1934 it is still apparent that the compromise with Ulrich was not to preserve an existing business but to enable the corporation to organize in the first instance. Sheppard testified "I knew very well when we owed $482,000 if there were any lawsuits brought against us I could not perfect the organization." Again he says "* * * he could have done us so much damage that I could not have gone ahead. I could not have effected this company *209 if he had brought a lawsuit. As a matter of fact if he had brought a lawsuit I never could have gone ahead and issued $482,000 of bonds." Later asked if his testimony was that "had Mr. Ulrich brought suit on this note, you could not have gone ahead with your plans and perfected this company" his answer was "Yes sir." A little later he adds that if a lawsuit had been brought against the company "I think it must be apparent that I couldn't have gone ahead with it." From all of this we are convinced that the $10,000 was a capital expenditure in the organization of the company and the acquisition of the properties of the Gilmore Co. of Texas. Ulrich asserted a claim founded on the obligation of the Gilmore Co. of Texas. The petitioner calls it one of those "further claims against the said property as may be lawfully made at the time of sale" which the plan of the bondholders provided should be paid. Had the $10,000 been paid for the property itself or to satisfy a judgment to clear title to the property it would clearly be a capital expenditure. It is none the less if it was a claim against the property, paid by the petitioner. Ulrich "wanted me [Sheppard] to treat him as a bondholder" *210 along with the other $482,000 par value of bonds outstanding. We think the sound view is that this expenditure was capital. Petitioner, with the burden, has not shown it to be otherwise. We see no essential difference in principle between the situation here and that in Brown Fence & Wire Co., 46 B.T.A. 344, where the petitioner paid the transfer tax of its predecessor whose liabilities it had assumed as part of the cost of the assets acquired from such corporation. We there held that petitioner was not entitled to a deduction of the amount "for the payment of the liability was a part of the cost of the assets acquired." See also Levitt & Sons, Inc., 5 T.C. 913. In addition, we are not convinced that the promise made in 1934 to pay the $10,000 was actuated by desire to preserve the business from disruption so much as it was from a voluntary desire of the president to see that all debts were paid. However laudable this desire was it does not appear to us to constitute a compelling fact requiring the satisfaction of the debt. Sheppard, the president, testified when asked "why you believe that you could not have gone ahead and perfected the company had he brought *211 suit?": "It is the first time I ever failed in business and it broke my heart, and I made up my mind that I was going to pay these people back, so I went down and bid in the property, and I have worked ever since to try to pay people off. Not only am I going to pay them off, but I am returning the money to the stockholders in the Forrest E. Gilmore Company of Delaware, about four million dollars more, because it hurt my conscience." It may be worthy of comment also that Mr. Sheppard refers at one place to Ulrich as "Ed." and stated that he had known him a long time. All of this, together with the fact that Ulrich had $18,000 of the certificates which in the absence of other circumstances would have been affected along with the holders of the other $482,000 certificates or bonds if suit had been brought, raises doubt as to whether Ulrich's threats to disrupt the organization were the actuating cause of the agreement to pay him when the other bondholders were paid. In fact he was paid before the payments to bondholders were completed. The petitioner has not shown any circumstances to indicate that Ulrich would not have been taking a chance of sacrificing $18,000 of bonds, in order to *212 attempt to collect $10,000 more, had he by starting suit disrupted the reorganization. We think that the expense has not been shown to be other than a capital expenditure, or caused by desire to preserve an existing business. The above conclusions dispose of the further idea that a $10,000 loss grew out of the acquisition of the properties, for the properties have not been disposed of and thus no loss has been ascertained, if, as above concluded, the expenditure was capital in its nature. As we have said, it has not been shown to be otherwise. Likewise our conclusions above dispose of the alternative contention by the taxpayer that it paid a debt upon which it was secondarily liable; was unable to secure restitution from the party primarily liable, therefore sustained "a loss of $10,000 by virtue of a worthless debt"; for under that heading it argues, as we have above seen that there was implied assumption of the obligations of the Gilmore Co. of Texas. Any such assumption, in our view, makes the expense a capital expenditure. With reference to petitioner's contention that in 1943 it paid $7,175 interest on the note and should be allowed that much as a deduction: The contention *213 is unsound, first because no agreement by petitioner to pay interest is shown, and second because the petitioner is on the accrual basis of accounting, therefore could not in 1943 take as a deduction more than the interest accruing during that year. The evidence merely shows in general terms a "deal" made by Sheppard to pay Ulrich when the bonds had been paid. The petitioner, contending for its liability to pay interest, had the burden of showing agreement not merely to pay the debt, but to show definitely and affirmatively an obligation to pay interest. No such showing is made. The note, of course, bore interest, but the petitioner's obligation, if any, inheres, not in the written note, but in an oral understanding or "deal." No agreement by petitioner appears endorsed on the note, or is otherwise shown in writing, and the oral evidence is merely that demand was made for the payment of the note, that Sheppard told Ulrich they would pay him when the bonds were paid off, that he reported the "deal" to the board of directors and they said "Okay but we can't pay it until after the mortgage indebtedness is paid." This comprises no proof of agreement to pay the interest on the debt of another. *214 Moreover, that there was no agreement to pay interest is indicated in the language of the resolution of November 4, 1943, for it is there recited that the president stated that the corporation "was obligated to pay $10,000.00 in interest and principal," and again that the corporation had agreed "to pay to the holder of this note the sum of $10,000 * * *." It is true that the resolution also refers to the president's statement that there was due on the note itself $7,000 interest, but the note was that of another, and petitioner's obligation was oral, and the limitation of the amount due to $10,000, both in the language above referred to, and in the payment itself, shows that there was no conception of liability for $10,000 and interest. We conclude that there was no obligation to pay interest. So far, however, as concerns all years prior to 1943, no deduction would be allowable, even if there was agreement to pay interest, since, being upon the accrual basis, the petitioner was entitled to deduction for any interest owed, during the years in which it would properly be accrued. In fact, the evidence does not indicate that it was not so accrued on the corporate books. If it was, clearly *215 the deduction of the whole $7,175, would be improper in 1943. If it was not so accrued in earlier years that fact would be an indication that the corporation did not consider itself liable for interest. We conclude that no deduction in 1943 for interest is proper. We conclude and hold that the petitioner has not shown error in the adjustment of petitioner's income by disallowing the $10,000 as a deduction. (2) The second question for our consideration is whether the amount of $4,773.92 expended by petitioner during 1943 on a steam condensing tower constituted a capital expenditure or an ordinary and necessary business expense. The substance of petitioner's argument on this question is that the expenditure was used in repairing a cooling tower and that "the condenser sections repaired did not constitute an addition to the plant, nor did it materially add to the value of the plant, nor did it prolong its useful life but only maintained the plant in ordinary operating condition." (Italics supplied.) Respondent, on the other hand, argues that the expenditure was used to replace "nine of the ten" condenser sections. Respondent cites such cases as First National Bank of St. Louis, 3 B.T.A. 807; *216 Leedom & Worrall Co., 10 B.T.A. 825; Covington Cotton Oil Co., 12 B.T.A. 1018; H. S. Crocker Co., Inc., 15 B.T.A. 175, and others, to establish the basis for his contentions. On the basis of the authority cited by respondent and the facts of the case, we hold that the expenditure here in question was for replacing the steam condensing sections and therefore, constitutes a capital expenditure. This was no mere repair. A question as to an expenditure of $1,244.10 on an 800 barrel tank was conceded, on brief, by petitioner. Decision will be entered for the respondent.